UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                                    Case No. 10-20941-AJC

Biscayne Park LLC,                                        Chapter 11

          Debtor.
_____/

## MOTION FOR THE APPOINTMENT
## OF CHAPTER 11 TRUSTEE PURSUANT TO 11 U.S.C. § 1104(a) OR,  IN THE
## ALTERNATIVE, MOTION TO DISMISS FOR
## BAD FAITH FILING PURSUANT TO 11 U.S.C. §1112(b)

Secured creditor Madison Realty Capital, L.P. (**"Madison"**) hereby moves for entry of an

order directing the appointment of a Chapter 11 Trustee pursuant to section 1104(a) of chapter

11 of title 11 of the United States Code (the **"Bankruptcy Code"**), and Rule 2007.1(a) of the

Federal Rules of Bankruptcy Procedure. In the alternative, Madison moves to dismiss for cause

based upon a bad faith filing pursuant to 11 U.S.C. §1112(b).   In support of this Motion,

Madison respectfully represents as follows:

### PRELIMINARY STATEMENT

As a Florida State Court has already observed, the Biscayne Park Property (as defined

below) is a wasting asset.  That observation is even more compelling now that the Debtor,

Biscayne Park, LLC (**"Biscayne Park"**) has filed for bankruptcy and, as discussed in full detail

below, continues to make no progress to remedy any of the myriad problems that exist at the

Biscayne Park Property.  To provide a summary of some of these disturbing problems, Biscayne

Park (i) has failed to address environmental problems at the Biscayne Park Property, including

the presence of harmful levels of arsenic, (ii) has failed to pay any real estate taxes or insurance

in connection with the Biscayne Park Property since 2008, (iii) has allowed the Biscayne Park

Property to deteriorate into a "jungle," and (iv) has grossly mismanaged the Biscayne Park Property, including the failure to properly account for rents, revenues and security deposits received, so much so that a Florida state court felt compelled to appoint a receiver at the Biscayne Park Property, which prompted the filing of this bankruptcy case.

The points enumerated above are only a sample of the numerous facts that will be discussed herein and proven at the hearing on this Motion and which warrant the appointment of a chapter 11 Trustee. In short, Biscayne Park has been and remains rudderless, with no direction, and is drifting aimlessly in bankruptcy. As a result of the above and for other reasons set forth herein, there can be no question that Biscayne Park has failed miserably in the exercise of its fiduciary duties and has, at a minimum, grossly mismanaged the Biscayne Park Property to the detriment of its hundreds of residents and Madison. Therefore, cause clearly exists for the appointment of a chapter 11 Trustee under section 1104 of the Bankruptcy Code to take control of and manage the Biscayne Park Property to protect and attempt to move this case to a positive resolution. Moreover, the appointment of a chapter 11 Trustee under the facts of this case is undoubtedly in the best interests of all creditors.

## JURISDICTION AND VENUE

This Court has jurisdiction to entertain this Motion pursuant to 28 U.S.C. §§ 157(b) and 1334(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1408(1).

This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), seeking relief under 11 U.S.C. §§1104(a)(1) and (2), and Bankruptcy Rule 2007.1(a).

## GENERAL BACKGROUND

On April 26, 2010 (the "**Petition Date**"), Biscayne Park filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code. Biscayne Park continues to

operate its business and manage the subject property as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108.  No trustee or examiner has yet been appointed in this case.

Before the Petition Date, on or about November 9, 2006, Madison and Biscayne Park entered into a Mortgage Note (the **"Note"**), pursuant to which Madison made a loan to Biscayne Park in the original principal amount of $8,150,000.00 (the **"Loan"**).  The Note was secured by, among other things, a Mortgage and Security Agreement (the **"Mortgage"**) between Biscayne Park, as Mortgagor, and Madison, as Mortgagee, dated as of November 9, 2006, and an Assignment of Leases and Rents (**"Assignment of Rents"**) dated as of November 9, 2006, made by Biscayne Park in favor of Madison.  (The Note, Mortgage, Assignment of Rents, and other documents executed in connection with the Loan may sometimes hereafter be referred to as the **"Loan Documents"**).  As a result, Madison holds, among other things, a first perfected mortgage and assignment of rents on the Little Farm Trailer Park located in El Portal, Florida, as well as an adjacent parking lot, retail and vacant land, which is owned by Biscayne Park (collectively, the **"Biscayne Park Property"**) as collateral for the Loan.

Biscayne Park committed events of default under and as defined in the Loan Documents, *inter alia*, by virtue of its failure to pay a scheduled payment that was due on May 15, 2009, and all payments thereafter.  By letter dated June 8, 2009, Madison notified Biscayne Park that it had defaulted on the Loan due to the failure to make the May 15, 2009 payment.

On or about July 6, 2009, Madison commenced an action in state court (the **"State Court Action"**) demanding all amounts due under the Note and Mortgage.  The State Court Action is styled as *Madison Realty Capital, L.P. v. Biscayne Park, LLC, et al.*, Case No. . 09-51118 CA 31, 11th Judicial Circuit Miami-Dade County.   At present, there is due and owing by Biscayne Park to Madison the principal amount of $8,150,000.00, plus interest, costs and attorneys' fees.

On or about August 24, 2009, Madison filed a Motion for Appointment of Receiver and Order to Turn Over Rents in Accordance with § 697.07, Florida Statutes in the State Court Action.  In the interim, in November 2009, the loan matured, after Biscayne Park had already received two extensions on the maturity date..

The receivership hearing was originally set in December 2009 but was moved to January 8, 2010. The day before the hearing, the parties entered into a stipulation on assignment of rents, which they announced to the State Court on January 8.  On January 21, 2010, the State Court entered the parties' Stipulated Order on Assignment of Rents (**"Rent Order"**), which among other things required Biscayne Park to (i) deposit all monies received from the Biscayne Park Property into a Property Account; (ii) provide Madison with all bank statements and copies of cancelled checks from January 1, 2010 forward, to be received within 5 days of receipt by Biscayne Park; (iii) submit to Madison an accounting of all security deposit obligations held under the leases for the Biscayne Park Property, to be revised monthly; and (iv) prepare a proposed monthly budget.  The purpose of the Rent Order was to provide to Madison a full, timely and accurate accounting of all operations at the Biscayne Park Property, to impose certain requirements in connection with those operations, and to obviate the necessity for the appointment of a receiver.  The Rent Order did reserve to Madison the right to renew its motion for appointment of a receiver.

After receiving two months of financial statements, Madison concluded that Biscayne Park was not producing complete and accurate information on the operations of the Property, that the records it received did not make sense when compared to financial information received the prior year, and that Biscayne Park was diverting funds from the Property.  Madison filed a renewed Renewed Motion for Appointment of Receiver in the State Court Action on March 25,

2010.  The bases for the Renewed Motion for Appointment of Receiver were fourfold: (i) Biscayne Park has failed, since 2007, to adequately address the Notices of Violation issued by Miami-Dade County's Department of Environmental Resources Management; (ii) Biscayne Park failed to pay the real estate taxes on their respective parcels of the property since 2008; (iii) Teresa Cardenas, a defendant in the State Court Action, failed to pay property insurance on her multi-family apartment building and single family residence;[1] and (iv) Biscayne Park failed to produce a proposed monthly budget acceptable to Madison.  On April 6, 2010, Madison took the deposition of Biscayne Park's corporate representative, and learned that not only were its concerns all confirmed, but that Biscayne Park had grossly mismanaged the Property: Biscayne Park had maintained virtually no records on monies received (or any accounting on which monies had been received in cash), had inflated its proposed budget to add fees and personnel that had never been part of the company's operations, had paid its attorneys $45,000 on the date that the parties had agreed to the Rent Order, without any authorization and in violation of its own proposed budget, and could not account for tens of thousands of dollars in 2010 and hundreds of thousands of dollars in 2009.

On the Petition Date, after an hour hearing, the State Court entered an Order Appointing Receiver.  Biscayne Park filed its petition within 30 minutes of entry of that Order, and the receiver never took office or possession of the Biscayne Park Property.

## FACTS SUPPORTING THE APPOINTMENT OF A TRUSTEE

### 1.    Biscayne Park Has Failed to Address Environmental Problems at the Biscayne Park Property.

The Biscayne Park Property is in danger because since at least June 2007, Miami-Dade County's Department of Environmental Resources Management (**"DERM"**) has detected

---

[1]   The single family residence was not the subject of the Renewed Motion to Appoint Receiver and is not at issue in this Motion since it is not encompassed within property of the Biscayne Park bankruptcy estate.

environmentally unacceptable levels of arsenic, which have yet to be remedied.  The first Notice of Violation was issued by DERM on June 7, 2007.  As a result of this notice, a site assessment was conducted on the Biscayne Park Property[2], and on October 25, 2007, a Site Assessment Report was submitted to DERM.  Consequently, in November 2007, DERM issued its Notice of Violation and Orders for Corrective Action to Biscayne Park.  This notice stated that the **_concentrations of "arsenic in uncovered, surficial soils pose an unacceptable exposure risk to human health_**" and DERM ordered Biscayne Park to submit a Corrective Action Plan (**"CAP"**) to address the problem **_within 15 days_**.  (emphasis added).  Over the next approximately two years, Biscayne Park submitted a number of inadequate Corrective Action Plans, and on February 9, 2009, DERM issued its Final Notice Prior to Court Action (**"Final Notice"**).

The Final Notice stated that Biscayne Park had "failed to adequately respond" to DERM's previous notices, and gave Biscayne Park thirty days to correct the violations.  In response to the Final Notice, on March 20, 2009, counsel for Biscayne Park sent DERM an e-mail claiming that the monitoring wells on the Biscayne Park Property had been destroyed, but that Biscayne Park "plan[s] to send you a formal response to your recent enforcement correspondence. … Biscayne Park is moving ahead on the CAP and assessment activities."  On March 20, 2009, DERM advised Biscayne Park that it was referring the matter to the Miami-Dade County attorney's office for "appropriate legal action" because of Biscayne Park's "failure to adequately respond to the terms of these notices/letters," referencing the November 20, 2007, March 18, 2008, December 10, 2008 and February 9, 2009 enforcement letters.  Biscayne Park has yet to address the DERM violations, thereby exposing the residents on the Property to

---

[2]  The site assessment was conducted by Kimley-Horn and Associates on behalf of the Neighborhood Redevelopment Corportation (**"NRDC"**).  Kimley-Horn and Associates was under a contract with NRDC to perform environmental due diligence activities in association with acquisition of the Biscayne Park Property.

unacceptable levels of arsenic.  It has been estimated that the cost to remedy the arsenic problem is approximately $800,000.

When first asked at his April 7, 2010 deposition about the DERM violations Magdiel Fernandez, the corporate representative for Biscayne Park, said "I don't know … we have, I believe, corrected some [of the violations], but others I'm not sure if they have been corrected or not."  April 7, 2010 Deposition of Magdiel Fernandez (**"Fernandez Dep."**) at 65:13-15.  When later asked about soil and groundwater analytical concentrations of arsenic that exceed cleanup target levels, Mr. Fernandez said "No. I don't think it has been corrected."  *Id*. at 66:8-15.

### 2.    Biscayne Park Has Failed to Pay Taxes and Insurance.

Biscayne Park's neglect of the Biscayne Park Property further extends to their failure to pay real estate taxes since 2008.  After the 2007 taxes became delinquent sometime between April and June 2008, tax certificates were issued and sold, thereby creating a lien on the Biscayne Park Property.  S*ee* Fla. Stat. § 197.432 (providing that the sale of a tax certificate creates a lien on the property).  If Madison had not commenced the State Court Action, placing a stay on the tax deed process, the holders of these 2008 tax certificates would have been entitled to submit a tax deed application in April 2010.  *See* Fla. Stat. § 197.502 (providing that the holder of any tax certificate may file an application for a tax deed at any time after 2 years have elapsed since April 1 of the year of issuance of the tax certificate).  This problem continues.

### 3.    The Biscayne Park Property Is Deteriorating Quickly.

On the front page of the April, 2010 issue of *The Biscayne Times* is a photo of The Little Farm Trailer Park with the cover story titled "From Lovely to Lousy to Lost, Little Farm Trailer Park, a landmark just off the Boulevard is going down fast." *See* "From Lovely to Lousy to Lost," Erik Bojnansky, Biscayne Times, April 2010, Volume 8, Issue 2, pp, 1, 14-16, 18-21, a

copy of which is attached hereto as **Exhibit "A"**.  The story describes the Biscayne Park Property as "a mobile home community … where people of all ages and backgrounds uneasily co-exist in cramped quarters, and where police say criminal activity is rampant."  *Id*. at p.1.  The author notes that "[c]onditions at the park are deteriorating rapidly.  In fact so many trailers are in such poor condition that El Portal officials now refuse to issue permits for any type of construction on the property."  *Id*. at p. 15.  Among the "myriad problems" chronicled at the Park are "high levels of arsenic in the soil and groundwater," numerous trailer fires "sparked by substandard electrical wiring," management which is unavailable to the residents, a "perpetual crime wave," "nonfunctioning street lights," and sanitation.  *See id*. at pp. 14-16, 19, 21.  One resident described the Park as "a little jungle."  *Id*. at 19.  The author used this term to help describe the sanitation problems at the Park.

> As you might expect in a jungle, sanitation can be an issue.  The trailer park is not hooked up to the county sewer system.  Instead human waste from more than 200 trailers is pumped into a septic tank designed for just 65.  Sewage backups were not uncommon, so four years ago the county's Department of Environmental Resources Management (DERM) demanded that Little Farm link to the system.  After negotiating several extensions, and paying a $36,000 penalty, Biscayne Park LLC now has until June to comply with DERM's demands.  No overflows have been reported since 2007, but some residents say they keep their windows sealed against a wafting stench.

Although sanitation is a problem at the Park, the author notes that "DERM and Miami-Dade Health Department officials are more worried about high concentrations of arsenic in the park's soil.  [DERM's] testing found nearly five times the level considered to be dangerous to humans.  Ingesting or inhaling such high levels of arsenic over a long period can cause a wide range of problems, such as headaches, convulsions, diarrhea, hair loss, kidney failure, liver failure, cancer, and lung disease.  *Id*. at p. 18.  "So far … the health department is not aware of any cases of arsenic poisoning, but that hasn't stopped the county attorney from filing a lawsuit

against Biscayne Park LLC to force a cleanup." *Id*. at 18.  Moreover, "[c]ounty officials say portions of the land … pose a health hazard serious enough to have caused Wal-Mart executives to back out of a recent deal to purchase and develop the property." *Id*. at 14.  At the hearing on the Motion, each of these facts will be proven.

**4.       It is Unclear Who is Managing the Biscayne Park Property.**

The Biscayne Times article also mentioned unavailable management.  Mr. Fernandez's answers at deposition regarding management of the Park were equally confusing as his answers with respect to the DERM violations.  At first, when asked about the "property management fee" which appeared on the pre-petition budget, and if there was a separate management company managing the property, Mr. Fernandez said "[n]o.  Basically …. we [Teresa Cardenas, my mother, and I are] the ones actually doing the management."  Fernandez Dep. at 87:14-25.  However, later in the deposition, Mr. Fernandez identified Esteban Perez as the "on-site property manager." *Id*. at 91:23-24.  When asked about Mr. Perez's duties, Mr. Fernandez answered:

> He basically, for example, if we have to go out and post three-day notices, he does that.  He's the one that overlooks the park, runs around every morning and gives Roberto Bulnes and Emilio I guess their orders for the day.  He's in the office collecting the rent in the office.  If anyone has a complaint or has an issue or problem, whatever it is, he's their initial contact, the first contact, and they would go to him and he files reports and that kind of thing.

*Id*. at 92:1-10.  And on Mr. Perez's one day off, Wednesday, someone from the Fernandez's trucking business, Metropolitan, fills in for him. *Id*. at 92:12-93:19.

Mr. Fernandez never offered his or his mother's role as property managers.  And in fact, he admitted that the $4,000.00 per month "Property Management Fee" was created at the time Biscayne Park was obligated to come up with a proposed budget in the State Court Action. *See* Fernandez Dep. at 89:12-24 ("[I]n the absence of …putting up a management company, since we were the ones doing, basically performing the work, we thought we might as well get a

9

management check in the budget."). In other words, Biscayne Park simply decided to load up the pre-petition budget with costs that did not previously exist.

> **5.      Biscayne Park Has and Continues To Commit Financial Waste on the Biscayne Park Property.**

The purpose of the parties entering into the Rent Order was to allow Madison to obtain accurate, up to date financial information on the revenues from the Biscayne Park Property and expenses being incurred, and thereafter to have adequate assurances that revenues were being properly applied to legitimate expenses. Biscayne Park did not, and cannot, provide either.

> **a.      Biscayne Park Could Not Explain What Happened to Surpluses From the Revenues Received.**

Based on the rent rolls provided by Biscayne Park pursuant to the Rent Order, the Biscayne Park Property was generating at least $30,000 a month in revenue over and above the expenses provided by the pre-petition budget. Moreover, for the month of February 2010, there was an approximately $50,000 difference of revenue over expenses. Other than pointing to certain attorneys' fees paid, Mr. Fernandez could not provide an explanation of how this monthly surplus was being spent. *See, e.g.*, Fernandez Dep. at 116:11-118:8 ("It's not very difficult to run up a lot of the fees and professional services."). Yet, when provided with the figure of $420,000, which would have been the yearly surplus if the monthly surplus was $35,000, and asked if he believe he spent $420,000 on attorneys for the year, Mr. Fernandez clearly answered "no." *Id*. at 118:10-119:6. After calculations were made for payment of the mortgage through April 2009, for payment of other expenses and for professional fees of approximately $9,000 per month, Madison arrived at the figure of $190,000 as the approximate amount of surplus for the year. *Id*. at 119:7-23. When asked what happened to that approximate $190,000 in surplus Mr. Fernandez answered "[t]hat money I - we might have. I don't know … Yeah, I don't know. I

could go back and look at it.  It's not there and it was paid out in expenses, you know." *Id.* at 121:1-6.

### b. Biscayne Park is Unable to Even Account for the Amount of Cash Rental Payments Being Received.

From the records reviewed to date, and from Mr. Fernandez's testimony, it is equally unclear as to the amount of cash rental payments that Biscayne Park has been receiving from its residents, how such cash has been used, and whether it has been deposited in the Property Account.

For example, when asked if the Park received any rent payments in the form of cash, and how many residents pay in cash, at first Mr. Fernandez explained that the Park has a policy against paying in cash but said "[s]ometimes a few pay in cash."  Fernandez Dep. at 69:14-23. When asked again for an estimate of how many residents pay in cash, Mr. Fernandez said "I would like to say the majority is probably, you know, money orders or checks, but I can't specifically say what the amount is that was paid in cash.  Maybe Martha could say that better than I could." *Id.* at 76:15-19.  Martha never offered a more definite answer.  Neither the newly created rent rolls, nor the prior "checklists" maintained by on-site property managers indicate the form in which rental payments were made, e.g., whether in cash, check or money order. Moreover, it was unclear from the deposition testimony whether any cash received by residents is used for petty cash. *Id.* at 103:6-15.  In sum, Biscayne Park has no record of the receipt or use of cash payments received from residents, and thus there is no record of whether such payments were ever deposited into the Property Account.

### c.    Biscayne Park Is Unable to Explain Who is Maintaining Its Books and Records, Or Explain A $11,000 Discrepancy Between Rents Received and Money Deposited Into The Property Account.

It was unclear from the deposition testimony who has been maintaining Biscayne Park's books over the last three years.  At first, it appeared that Mr. Fernandez's wife, Martha, was the sole person managing the books because she prepared the rent rolls for the Park.  *See* Fernandez Dep. 75:5-19

The subject of Martha Fernandez preparing the rent roll came up because according to the January 2010 rent roll, Biscayne Park received rents in the total amount of $66,284.00.  However, during the same month, only $55,492.00 was deposited into the Property Account, which is a difference of approximately $11,000.00.  *See id*. at BP000055,  Neither Magdiel nor Martha Fernandez could explain this discrepancy.   Magdiel Fernandez said "I don't know honestly what the discrepancy may be.  I could say it may be an error."  Fernandez Dep. at 74:13-14.  Martha Fernandez said " [i]t was the first time I did it, [prepared the rent roll], so it could be that I didn't delete first, which is what I do now.  So, I mean, there could be room for error because I had never done it before."  *Id*. at 77:2-10.  No further explanation for the $11,000 was given through the course of the deposition.

Furthermore, it soon became clear that Biscayne Park began preparing rent rolls only when the parties began negotiating the Rent Order in January 2010.  *See* Fernandez Dep. at 77:2-14.  (When asked if Biscayne Park maintains a rent roll every month for the tenants, the answer was "[w]e do now, yeah.").  When asked what was done for the more than three years before Biscayne Park began preparing a rent roll, Mr. Fernandez answered "I mean, pretty much, you know, we have the on-site manager that would just check off and say these guys paid".  *Id*. at 77:17-21.

Later in the deposition, when asked specifically who does the bookkeeping for Biscayne Park, Mr. Fernandez answered "[f]or that we have, Martha helps us with the bookkeeping, but also Emil Esmurdoc.  He does processing of evictions … [and] pays the bills."  Fernandez Dep. at 93:24-94:4.   But Mr. Esmurdoc, whose title is "[k]ind of a bookkeeper," only "started probably February or March [of this year] maybe." *Id*. at 94:12-18.   Before Biscayne Park hired Emil Esmurdoc, someone named Juanes, who was paid through Mr. Fernandez's other business, apparently managed the books.  *Id*. at 94:24-95:7.  It was not clear how long Juanes managed the books or if this was a full-time position.  Furthermore, even after Mr. Fernandez identified Emil Esmurdoc, the newly hired full-time "kind of bookkeeper" for Biscayne Park, he still added that "[a]lso my wife, you know, she does some of the work also."  *Id*. at 95:7-96:1.  So, in the end, it still was not clear who in fact was maintaining the books on a daily basis.

> **d.    It is Unclear Whether Biscayne Park is Holding Security Deposits for its Residential Tenants**.

It is also unclear from the deposition whether Biscayne Park currently is holding security deposits for any of the residential tenants.   When first asked how many security deposits Biscayne Park holds, Mr. Fernandez answered that the security deposits for the two commercial tenants, Miami Subs and Laundry Place, in the amounts of $3,300 and $1,500, respectively, were "*pretty much* what we have in the deposits.  The residents don't have any deposits."  Fernandez Dep. at 106:24-25 (emphasis added).  Then, when asked "[y]ou didn't ask for first month or last month," Mr. Fernandez answered "[w]e do now, but most of the times they live for the most part and use it in the month…. so that's why we don't really …"  *Id*. at 107:1-12.  When asked if the Park keeps a log of deposits, Mr. Fernandez answered, "[w]e do but … for the most part we don't really keep the deposits anyways.  We don't get deposits.  Going back, trying to recall, we usually ask them for first month and end deposit month.  And for the most part they can't afford

both, so we allow them to come in with basically the first month rent." *Id*. at 107:13-21.  Then, when questioned again whether Biscayne holds deposits for any of the approximately 200 residential tenants, Mr. Fernandez first answered "no," then went on with the confusing explanation that "[m]ost of [the tenants] we basically have inherited them when we had purchased the property.  There really aren't that many that have come in here new.  So it's -- these are just the ones that we do have deposits on, but the other ones we really don't have any deposit." *Id.* at 107:25-108:7.  When asked what "really don't" means, Mr. Fernandez answered "… I apologize.  I'm trying to recall."  In sum, Madison has no idea how much Biscayne Park is holding in security deposits.

### e.    Biscayne Park Cannot Provide Explanations for Certain Entries in The Pre-Petition Monthly Budget.

During the course of the deposition, Mr. Fernandez was questioned about each item in the pre-petition budget.  For some of the listed monthly expenses, Mr. Fernandez could not provide an explanation for the figure used.  For example, the pre-petition budget listed a monthly expense of $2,300 per month for insurance.  When asked if Biscayne Park is "actually writing checks for $2,300 a month for insurance," Mr. Fernandez answered "[n]o."  Fernandez Dep. at 83:12-15.  Then, Mr. Fernandez tried to retrace how this figure was formulated including whether the figure encompassed insurance for the truck as well as general liability for the Park, and his final answer was "I don't know why the big gap [between the cancelled checks and the figure in the pre-petition budget], but I think the best way to look at that time is, I guess, these past maybe three months, look at what the average of the insurance payment has been.  That's a pretty good average of what the monthly payment is." *Id.* at 83:16-84:20.  Yet looking at the cancelled checks of insurance payments provided for by Biscayne Park for the three month period in question, the average payment is $1,016.62 not $2,300.

Mr. Fernandez could also not adequately explain the gap between the proposed monthly payroll expenses, in the amount of $6,400.00, and the payroll checks provided to Madison pursuant to the Rent Order, which averaged approximately $4,000.00 per month.  His only explanation was that more employees were working for Biscayne Park in December 2009, but the checks provided to Madison begin on December 22, 2010, and the only difference between the checks from December 2009 and January 2010 is the termination of Roger Lopez and the hiring of Emil Esmurdoc, so it would appear that the amount in payroll would remain approximately the same.  *See* Fernandez Dep. at 97:17-23.

After having received two months worth of documents, Madison concluded that the reported expenses did not appear to bear a reasonable relationship to information previously reported and that the reported payroll did not bear a rational relationship to the needs of the Biscayne Park Property.  For example, the pre-petition budget proposed by Biscayne Park pursuant to the Rent Order claimed that its employees were being paid $6,400 per month.  But the cancelled checks provided by Biscayne Park reflected that from December 22, 2009 through January 18, 2010, payroll checks totaled only $3,590, and the payroll checks from January 19, 2010 through February 15, 2010, totaled only $4,462.88.  This is a difference of at least $2,000 per month.

Moreover, the pre-petition budget claimed that Biscayne Park paid $4,000 in "property management fees" per month, but nowhere in the documents are "property management fees" recorded.[3]  Additionally, based on a review of the documents provided, the pre-petition budget appears to inflate the amounts paid per month for insurance, septic tank cleaning, and water and

---

[3]   This issue is currently being discussed and negotiated by undersigned counsel and counsel for Biscayne Park in connection with the proposed budget for the Debtor's second interim use of cash collateral.  As of the filing of this Motion, the parties have not reached a resolution as to the $4,000 property management fee.

sewer.  Furthermore, it appears from a review of the rent rolls and the bank statements that for the month of January 2010, approximately $11,000 of the rents received were not deposited in the Property Account.  And on January 8, 2010, the same date that the Rent Order required that all rents, deposits and proceeds shall be placed in the Property Account, $25,000 was withdrawn from that account.  Finally, on January 17, 2010, $15,000 was paid to Biscayne Park's counsel in the State Court Action.  In sum, rather than pay the mortgage and real estate taxes, addressed below, Biscayne Park simply diverted income - i.e. Madison's collateral - for its own benefit.

> **f.    Prior to the Entry of the Rent Order, No Adequate Records Were Being Maintained for the Biscayne Park Property.**

Indeed, prior to the entry of the Rent Order, virtually no records were being maintained for the Biscayne Park Property, a period of more than three years.  For example, as described in detail above, the Park did not maintain any rent rolls, or any record of how rental payments were made.  *See, e.g.,* Fernandez Dep. at 77:2-14; 76:15-19.  Nor does it appear that there was any log of security deposits held for the Park.  *Id*. at 107:13-21.  Also, when questioned about how many tenants the Park had in the first six months of 2009, and whether there were less tenants today than in 2009, Mr. Fernandez answered "I don't know. …. [M]aybe there might have been more tenants in '09."  *Id*. at 110:9-111:4, yet on the other hand Biscayne Park claims that the number of evictions has increased.  *Id*. at 110:6-8.  Moreover, Mr. Fernandez testified that the reason Biscayne Park stopped making payments under the Loan was the "reduction in rents."  *See id*. at 28:8-18.

But when asked if Biscayne Park keeps any statistics from month to month as to how many tenants it has, Mr. Fernandez answered:

> A.    No. No.  Actually, I mean, basically just what we have in the rental office, whatever we reflect, but …

Q.      If someone wants to look back and look at March 2009 and see how many tenants you had in March 2009, is there a record to look at?

A.      Let me think.  We have, I guess we had different folks in the office. They had, I guess they each had a different list to keep track of who paid and who didn't pay.  We could look back see to find that list, but it wasn't very -- it wasn't very well kept …

Fernandez Dep. at 111:6-10.  Mr. Fernandez also did not know how many lots the Park has

available for rental.  *Id*. at 112:8-15.  And when asked if Biscayne Park has any books that would

reflect its expenses for 2009, Mr. Fernandez answered "[w]e could put stuff together." *See id*. at

122:11-13.

Q.      Well, I am asking do you have something right now that someone could go to and look at.

A.      No.

Q.      … And with respect to revenue, same thing.  Are there any records that you, that exist that have been created already that would show the monthly revenue for 2009?

A.      No, not that I can really remember, but I could back and put something together.

Fernandez Dep. at 117:14-22.

All of these matters are critical to the Biscayne Park estate and its creditors, and Biscayne

Park has given Madison no confidence that it can properly handle these issues.  The only

reasonable solution to this deteriorating situation is the appointment of a chapter 11 Trustee who

can work with Madison and other parties in interest to develop an appropriate strategy for

managing the Biscayne Park Property, one that will ensure that the Biscayne Park Property is

being effectively and efficiently operated for the benefit of its residents and to preserve its value

and maximize any potential returns to creditors of the estate.  This solution is clearly in the best

interests of the creditors in this case as Biscayne Park, left to its own devices, will continue to

fumble around to the detriment of those residents and creditors.  As documented throughout this

Motion, Biscayne Park's mismanagement of the Biscayne Park Property compels the

appointment of a chapter 11 Trustee, whether on the basis of "incompetence or gross

mismanagement" under Section 1104(a)(1) (or, arguably, fraud), or "in the interest of creditors"

under Section 1104(a)(2).

## RELIEF REQUESTED

Pursuant to section 1104(a) of the Bankruptcy Code, Madison requests that a Chapter 11

Trustee be appointed to take control of the Biscayne Park Property, to investigate Biscayne

Park's pre and post-petition conduct, financial affairs, internal controls, and books and records;

and simultaneously develop and oversee the management and operation of the Biscayne Park

Property.

## BASIS FOR RELIEF REQUESTED

Section 1104(a) of the Bankruptcy Code provides, in pertinent part:

(a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee —

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, . . .

(2) if such appointment is in the interests of creditors, any equity, security holders, and other interests of the estate . . .

(3) if grounds exist to convert or dismiss the case under section 1112, but the court determines that the appointment of a trustee or an examiner is in the best interests of creditors and the estate

11 U.S.C. § 1104(a). Whether a trustee should be appointed for cause under section 1104(a) of

the Bankruptcy Code is fact sensitive and must be analyzed on a case-by-case basis. *In re Sharon*

*Steel Corp.*, 871 F.2d 1217, 1226 (3d Cir. 1989). Based on the facts of this case, sufficient cause

exists to warrant the immediate appointment of a chapter 11 Trustee and such appointment would be in the interests of creditors and the estate.

While the appointment of a chapter 11 Trustee is the exception and not the rule, it is well-established that "in the appropriate case, the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of the creditors are served." *In re Intercat*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000) (citations omitted). Once "cause" is shown, however, appointment of a trustee is mandated. *See, e.g., In re Oklahoma Refining Co.,* 838 F.2d 1133 (10th Cir. 1988); *In re AG Service Centers LC,* 239 B.R. 545, 550 (Bankr. W.D. Mo. 1999); *In re Colorado-Ute Elec. Ass'n, Inc.,* 120 B.R. 164, 174 (Bankr. D. Colo. 1990); *In re PRS Insurance Group, Inc.*, 274 B.R. 381, 384 (Bankr. D. Del. 2001) (citations omitted); *In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989). Whether "cause" exists under section 1104 of the Bankruptcy Code is not limited to fraud, dishonesty, incompetence or gross mismanagement. *Crescive Landscape Mgmt. v. PHDC, LLC (In re PHDC, LLC)*, No. 03-93397, 2004 Bankr. LEXIS 1113 (Bankr. N.D. Ga., Apr. 28, 2004). Furthermore, subsection 1104(a)(2) allows appointment of a trustee even when no "cause" exists. *In re Sharon Steel Corp*., 871 F.2d at 1226.

For all of the above reasons, this Court should find that the appointment of a chapter 11 Trustee is appropriate and in the best interests of the creditors and the estate pursuant to 11 U.S.C. § 1104(a)(2).  First and foremost, it is clearly in the best interests of the creditors of the estate, in addition to the residents of the Little Farm Trailer Park, to ensure that the environmental, sanitation, and security problems at the Biscayne Park Property be remedied immediately.  Biscayne Park's inability or unwillingness to address these problems is detrimental

to the estate and its creditors. Moreover, as noted above, it is unclear at best as to who exactly is managing the Biscayne Park Property and what that (or those) individual(s) have been doing in terms of accounting with respect to rents received, security deposits and other revenues generated at the Biscayne Park Property.  A chapter 11 Trustee would be in a better position to oversee and manage the Biscayne Park Property, ensuring that the aforementioned hazards, including the "unacceptable exposure risk to human health" are immediately redressed.  "From Lovely to Lousy to Lost," Erik Bojnansky, Biscayne Times, April 2010, Volume 8, Issue 2, p18. Should a sale of the Biscayne Park Property be desired in the future, a trustee would be able to engage professionals to market the Biscayne Park Property, generate maximum interest and sell to the highest bidder as opposed to a sale arranged by Biscayne Park without testing the open market.  The appointment of a chapter 11 Trustee would preclude any further delays by Biscayne Park in the administration of the estate that may be detrimental to the creditors.  Furthermore, a chapter 11 Trustee will be able to conduct a proper investigation of Biscayne Park's pre-petition conduct and the financial management (or lack thereof) as discussed above.

In sum, this Court should appoint a chapter 11 Trustee in this case. The overwhelming benefits in appointing a trustee clearly outweigh any costs associated therewith.  On the other hand, the harm to the estate of displacing current management will be minimal to nonexistent.

Finally, subsection 1104(a)(3) provides that where grounds exist to convert or dismiss the case under section 1112, a chapter 11 trustee should be appointed if the court determines that appointment of a trustee is in the best interests of creditors and the estate. In the instant case, grounds exist to convert or dismiss the case under section 1112.

Section 1112 of the Bankruptcy Code provides in pertinent part:

> [O]n request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause . . .
>
> (4) For purposes of this subsection, the term 'cause' includes—
> (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B) gross mismanagement of the estate;
> (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public . . .
> (E) failure to comply with an order of the court;

11 U.S.C. § 1112(b)(1) & (4).   "Notably, when sections 1104(a)(3) and 1112(b) are read together, it seems clear that the court *must* appoint a chapter 11 trustee rather than convert or dismiss the case if section 1104(a)(3) applies." *In re Incredible Auto Sales LLC.*, No. 06-60855-11, 2007 WL 1100276, (Bankr. D. Mont., Apr. 10, 2007). Section 1104(a)(3) applies to the instant case – Madison has already established that appointment of a Chapter 11 Trustee is in the best interests of the estate and its creditors.

Grounds exist for dismissal of this case because Biscayne Park has failed to make the payments necessary for the maintenance of appropriate insurance on the Biscayne Park Property, in addition to its failure to pay any real estate taxes since 2008..  Furthermore, Biscayne Park failed to comply with the orders entered in the State Court Action, including the terms of the Rent Order, which necessitated the appointment of a receiver and ultimately prompted the filing of this bankruptcy case.   Additionally, there is no reasonable likelihood of rehabilitation here. Accordingly, because grounds exist for the conversion or dismissal of this case and it is in the best interests of the estate and its creditors that a Chapter 11 Trustee be appointed, this Court should exercise its powers under the Bankruptcy Code and appoint a Chapter 11 Trustee.

## MOTION TO DISMISS FOR BAD FAITH FILING

In determining whether the debtor has filed a petition in bad faith, "the courts may consider any factors which evidence  'an intent to abuse the judicial process and the purposes of the reorganization provisions,' or, in particular, factors which evidence that the petition was filed 'to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393 (11th Cir. 1988). The Eleventh Circuit identified circumstantial factors often used by the courts in evidencing a bad faith filing:

(1)    The Debtor has only one asset in which it does not hold legal title.

(2)    The Debtor has few unsecured creditors whose claims are small in relation to the claims of the secured creditors.

(3)    The property is the subject of a foreclosure action as a result of arrearages on the debt.

(4)    The Debtor's financial problems involve essentially a dispute between the Debtor and the secured creditors which can be resolved in the pending state court action;

(5)    The timing of the Debtor's filing evidences a intent to delay or frustrate the legitimate efforts of the Debtor's secured creditors to enforce their rights.

Based upon these factors, and all the facts recited above, this case cries out for dismissal based upon a bad faith filing.

Biscayne Park's sole asset is the Property. Biscayne Park has no significant creditors to speak of other than Madison.  The Property is the subject of a state foreclosure action in which a receiver was appointed.  The "arrearages" in this case are a matured debt, on which the Debtor had previously requested and received two long extensions. The Debtor's financial problems involve Madison's legitimate right to collect a matured, secured debt and foreclose its mortgage on the Biscayne Park Property; there are no other secured creditors.

Finally, there is overwhelming evidence that the timing of the Debtor's filing evidences an intent to delay and frustrate Madison's efforts to enforce its rights.  The parties agreed to a Rent Order in order to give the Debtor a chance to demonstrate that the Property was being run as best as possible.  Unbeknownst at the time, Biscayne Park immediately undermined that conditional trust by taking $45,000 of revenues to pay unbudgeted expenses, then by being unable to account for $11,000 of revenues based upon the records produced, by being unable to identify what percentage of revenues were receive in cash, and by proffering a proposed budget that was deliberately padded to include expenses that were never part of the operations of Biscayne Park. In sum, Biscayne Park never had any intent to act as a responsible steward of Madison's collateral.  Then, at the very time the receivership hearing was proceeding, Biscayne Park was finalizing its bankruptcy papers, which were filed a half hour after the state court judge signed the order appointing receiver, causing the state court judge to expend time and Madison to expend time and money in efforts that the Debtor, weeks in advance, had every intention to undermine.

Moreover, Debtor's operation of the Biscayne Park Property evinces a continuing course of conduct in looting the Biscayne Park Property while not paying the mortgage debt, taxes or insurance.  As discussed above, at his deposition the principal of Biscayne Park was unable to account for hundreds of thousands of dollars from 2009 that had been collected as rents but had not been applied to the mortgage, taxes or insurance.  Tens of thousand of dollars have been diverted this year that could have been used to at least pay taxes.  Madison's willingness to twice extend the maturity date of the loan and forbear on its receivership motion has been rewarded with deception.  The residents of the Biscayne Park Property have been treated even worse.

## CONCLUSION

WHEREFORE, for all the foregoing reasons, Madison respectfully requests entry of an Order providing for the appointment of a chapter 11 Trustee, and for such other and further relief as may be just and appropriate.  In the alternative, Madison moves to dismiss for cause based upon a bad faith filing pursuant to 11 U.S.C. §1112(b).

Respectfully submitted this 4th day of June, 2010.

GREENBERG TRAURIG, LLP

By:  /s/ Aaron P. Honaker
       RONALD ROSENGARTEN
       Florida Bar No. 387540
       rosengartenr@gtlaw.com
       AARON P. HONAKER
       Florida Bar No. 48749
       honakera@gtlaw.com
       1221 Brickell Avenue
       Miami, Florida 33131
       Tel: 305-579-0500
       Fax: 305-579-0717

       and

       ANDREW R. CARDONICK
       77 West Wacker Drive
       Suite 3100
       Chicago, IL  60601
       Tel: 312-456-8400
       Fax: 312-456-8435
       Admitted *pro hac vice*

Attorneys for Madison Realty Capital, L.P.

24

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 4, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the Service List attached to the original hereof, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s/ Aaron P. Honaker
Aaron P. Honaker

## Electronic Mail Notice List

The following is the list of **parties** who are currently on the list to receive e-mail notice/service for this case.

- Joel M. Aresty     aresty@mac.com
- Aaron P Honaker    honakera@gtlaw.com
- Office of the US Trustee    USTPRegion21.MM.ECF@usdoj.gov
- Erica S Zaron    cao.bkc@miamidade.gov

## Manual Notice List

The following is the list of **parties** who are **not** on the list to receive e-mail notice/service for this case (who therefore require manual noticing/service).

- (No manual recipients)

*59,742,868v3 6-4-10*

From Lovely to Lousy to Lost

Written by Erik Bojnansky Photos by Silvia Ros

**Little Farm Trailer Park, a landmark just off the Boulevard, is going down fast**



BT photo by Erik Bojnansky

The official address is 8500 Biscayne Blvd., but you won't easily see this 15-acre community from your car. To reach it from the Boulevard, drive west between the shuttered Price Supermarket and the abandoned Laundry Partners building (with its distinctive steeple) to a small roadway that leads to a metal gate.

Beyond the open gate lies a mobile-home community with a 66-year history known to few, where people of all ages and backgrounds uneasily co-exist in cramped quarters, and where police say criminal activity is rampant.

Because some unknown number of residents are undocumented immigrants, an accurate census does not exist, according to Jason Walker, manager of El Portal, within whose borders the mobile-home community exists. Walker's best estimate: Between 600 and 1000 people live there.

A mixture of quaint and ramshackle trailers share the property with an assortment of dogs, cats, ducks, and the occasional shrieking peacock roaming across the FEC railroad tracks from El Portal. Now and then a trailer will catch fire -- and they burn *fast*. County officials say portions of the land are contaminated and pose a health hazard serious enough to have caused Wal-Mart executives to back out of a recent deal to purchase and develop the property.

Welcome to Little Farm Trailer Park.



"The economy has forced us to make some adjustments," says Magidel "Mac" Fernandez, a partner in Biscayne Park LLC, the company that owns the property. "What we are going to do there -- we have no idea yet." Translation: It's in foreclosure.

Fernandez and his partners bought Little Farm Trailer Park and some adjacent commercially zoned land for $8 million in November 2006. By March 2007, retail behemoth Wal-Mart had its sights on the property and made a purchase offer, but withdrew a few months later, after preliminary tests uncovered high

levels of arsenic in the soil and groundwater.

EXHIBIT A

El Portal's Jason Walker says he knows of four potential buyers who walked away after learning about the environmental issues. An attempt to sell the trailer park for $17 million during a June 2009 auction at Miami Shores Country Club also failed.

Says Walker: "It would cost $10 million to clean up that place."



Yolanda Dorce has lived in her own trailer at Little Farm for the past 20 years. When she moved in, the park was neat and well maintained, and the rent she paid to the park's owners for her space was within her budget. "I only paid $180 a month in rent," she says. "Now I pay $500 a month." Dependent on her meager disability checks, Dorce has had to make some tough financial decisions lately -- either paying the rent, buying food, or doing laundry, but often not all three. "My home is ugly. I can't afford to fix it up or make *myself* look pretty," she says with a wan smile. "I can't even buy flowers."

Security guard Jean Reuben's monthly rent was $320 when he first bought his trailer in 2002. "Now it is expensive," says Reuben, who today is paying close to $550 per month. "They want too much. And the new management, when you *want* to find them, it is excuses, excuses." Still, he notes that those who pack up and leave often come back. "Because outside," Reuben says, "is too expensive."



New York native Michael Baragana fears he may *soon* be homeless. An installer of emergency doors in more prosperous times, Baragana now works whatever jobs he can find -- landscaping, moving furniture -- anything that will allow him to pay $500 a month for a one-bedroom, moldy trailer owned by Fernandez and his business partners. "He keeps trying to raise my rent," Baragana grumbles "He now wants $550 a month. I'm trying to negotiate him down to $450."

Fernandez denies raising rents at Little Farm, countering that "some people go months and months without paying rent."

Such disputes aside, one thing is clear: Conditions at the park are deteriorating rapidly. In fact so many trailers are in such poor condition that El Portal officials now refuse to issue permits for any type of construction on the property. Since last August, four trailers have burned to the ground. Investigators determined that three of the fires were sparked by substandard electrical wiring. One trailer was burned so badly that the cause of the fire remains unknown.

Virtually all of El Portal's police calls come from Little Farm Trailer Park. Last year alone there were 287, and they ran the gamut from petty annoyances to serious felonies: loud music, suspicious persons,

attempted suicide, domestic violence, drug activity, armed assault. In one four-week period last year, there were 14 hang-up calls to emergency 911 from the same address. The perpetual crime wave persists. Just last month there was gunplay. Someone was shot, but the incident is still under investigation and no other details were available at press time, including the condition of the victim.

Sgt. Ronnie Hufnagel, a 12-year veteran of the El Portal Police Department, says she and her colleagues arrest the same people over and over: "They drink, they do drugs, they break into each other's places."



Residents say Little Farm is unpleasant at night -- thanks in part to the park's nonfunctioning street lights -- but they are grateful for increased police patrols, which they believe have frightened off many of the young hooligans. Says Yolanda Dorce with a smile: "Police come, come, come. It's something for the residents."

Michael Baragana isn't so sanguine. Even in the daytime, he says, some residents think nothing of panhandling or even stealing. He recounts chasing down someone who tried to make off with his laundry detergent. Now his garbage can is chained to his rented trailer. "To be precise," he declares, "this is a little jungle."

As you might expect in a jungle, sanitation can be an issue. The trailer park is not hooked up to the county sewer system. Instead human waste from more than 200 trailers is pumped into a septic tank designed for just 65. Sewage backups were not uncommon, so four years ago the county's Department of Environmental Resources Management (DERM) demanded that Little Farm link to the system. After negotiating several extensions, and paying a $36,500 penalty, Biscayne Park LLC now has until June to comply with DERM's demands. No overflows have been reported to DERM since 2007, but some residents say they keep their windows sealed against a wafting stench.

DERM and Miami-Dade Health Department officials are more worried about high concentrations of arsenic in the park's soil. Their testing found nearly five times the level considered to be dangerous to humans. Ingesting or inhaling such high levels of arsenic over a long period can cause a wide range of problems, such as headaches, convulsions, diarrhea, hair loss, kidney failure, liver failure, cancer, and lung disease.

Because Little Farm's drinking water comes from the county, DERM says there's no danger of arsenic or other soil contaminants infiltrating the supply. And the trailer park's grassy areas reduce the risk of residents breathing in arsenic-laced dust, says Juan Suarez, an epidemiologist with the county health department. However, Suarez warns that there is danger if people "eat the dirt -- and with kids, that's possible." So far, Suarez says, the health department is not aware of any cases of arsenic poisoning, but that hasn't stopped the county attorney's office from filing a lawsuit against Biscayne Park LLC to force a cleanup.



Madison Realty Capital, a private lender, is also running out of patience with Biscayne Park LLC. Last June Madison filed a

foreclosure action to protect its $8.15 million mortgage and take control of the trailer park and various other properties Little Farm's investors had offered as collateral, including a house in neighboring Miami Shores owned by Fernandez and his wife. The foreclosure action also lists Carlos and Dora Cardenas, Martha Fernandez, and seven "John Does" as defendants.

According to public records, Biscayne Park LLC additionally has been stiffing the county to the tune of $820,000 in unpaid property taxes. And two years ago El Portal slapped a $991,000 lien on the property for a multitude of code violations. Today the lien has grown to $2.5 million. Village manager Walker says Biscayne Park LLC has done nothing about the lien and hasn't contacted him in the past few months.

Mac Fernandez insists he's "working with everyone" to address Little Farm's many problems. He also claims that he and his mother, Teresa Cardenas, are not solely responsible: "We're just managing partners, and there are several owners." Fernandez is also registered as a managing partner for a bus and truck driving school, as well as many other Florida businesses, ranging from hair extensions to insurance. "We can't disclose who the actual owners are," he says, though he's quick to blame them for turning down a recent offer. "We've had someone who wanted to purchase the property but they [the other owners] were not able to let it go."

Only a patchy history of the Little Farm property seems to be accessible, and the *BT*'s efforts to locate archival photographs have been unsuccessful. A county DERM official says in the 1930s a poultry farm existed on part of the land where the trailer park now sits. In those days, according to the official, arsenic was a commonly used herbicide and pesticide.

It's also possible the name "Little Farm" came from the Little Farm Grocery Store, which opened at 8360 Biscayne Blvd. in 1933, according to news reports. The now-defunct Price Supermarket replaced it many decades later and closed a few years ago.

By the 1940s, Miami was a popular tourist destination, with Biscayne Boulevard serving as the area's main artery -- at least until the end of the 1960s. The 1944 Miami City Directory lists 8500 Biscayne Blvd. as the home of Farm Side Trailer Park. Mobile-home dealerships operated at 8400 and 8570 Biscayne Blvd.

Mary Ramos has more recent memories. She bought a trailer at Little Farm 16 years ago. "Oh, it was beautiful," she recalls. "It was cheap, and a nice, nice place. It was only Canadian people here. Most of the time the place was empty."

The park was attractive, longtime residents say, because its owners at the time cared about it. Jack Schaufele, a sergeant with the El Portal Police Department, and his wife Nancy, bought Little Farm in 1988 for $2.73 million. "They were beautiful people. Nice, sweet," Ramos says.

In 1996 the Schaufeles sold the park for $4 million to a real estate investor named Sarika Olah. A few years later, Ramos says, Little Farm began accepting trailers from Nelson's Trailer Park. That mobile-home community shut down in 1999 to make way for the Home Depot at 12055 Biscayne Blvd. As the number of homes at Little Farm increased, sewage began oozing from the ground, sometimes backing up into trailers' bathrooms.

"I used to have a picture of the park from 12 years ago," says El Portal's Sergeant Hufnagel. "It looked like an elderly community from Palm Beach. But then it just went to hell."



By 2002 Olah had a contract to sell the land for $4.8 million to Miami-based Pinnacle Housing Group, one of the nation's largest developers of affordable housing. But Michael Wohl, one of Pinnacle's top executives, says there were a "host of issues" attached to the land, not least of which was zoning. Biscayne Park LLC's parcels along Biscayne Boulevard -- the vacant supermarket and laundry, as well as 76,000 square feet of land -- are in the City of Miami and zoned commercial. Another parcel of some 27,000 square feet lies behind the trailer park in unincorporated Miami-Dade, and is zoned for hotel/motel use. The 13.2 acres occupied by the trailers is in El Portal's jurisdiction. If the mobile homes were removed, its current zoning would only allow banks, office buildings, or studios, according to Walker.

In 2005, before Wohl could resolve these issues, Olah's company filed for bankruptcy. Her lender, Colonial Bank, demanded payment of its $2.3 million mortgage. To raise cash, Olah sought permission to solicit more lucrative offers. Wohl sued to defend his sales contract but later settled with Olah, clearing the way for Biscayne Park LLC to purchase the property out of bankruptcy.

Should Little Farm close, the mobile-home owners living there will find themselves in a bind. Because their homes are often no longer actually mobile, they're usually demolished when a park is sold and redeveloped. According to a recently released study conducted by Florida International University's Research Institute on Social and Economic Policy, mobile homes, also called manufactured homes, sell for an average of $14,000. But state law doesn't require owners of trailer parks to provide compensation to homeowners who are forced to leave, according to Alyce Gowdy Wright, executive director of South Florida Jobs With Justice and an advocate for trailer-park residents.

A $19 million public fund meant to help trailer-park residents relocate was raided by the Florida Legislature two years ago, says Gowdy Wright: "What they did with [the money] once it went into the state's general fund is anyone's guess."

During the most recent real estate boom, many trailer parks were purchased by a new generation of owners intent on collecting as much rent as they could before selling the land to a developer. But the economic crash put a quick end to many of those speculative endeavors, Gowdy Wright says.

Miami-Dade County's remaining 90 trailer parks, housing close to 60,000 people, are still tantalizing for speculators, she explains, because they offer the prospect of a cheap price for distressed property. Real estate investors, she says, call mobile homes "low-hanging fruit."

Patrick Duffy of Duffy Realty in Miami Shores, believes that keeping Little Farm as a trailer park is not "the highest and best use of the land." But even without the liens and environmental contamination, selling it will be a challenge. "We need more condominiums like a hole in the head," says the veteran Realtor. "You are not going to get financing to build anything on that property for five or ten years."

With the land's "myriad problems," developer Wohl says he no longer would touch the property, though he adds that for "somebody with patient money" it could be a good long-term investment.

But even if a deep-pocketed company like Wal-Mart were willing to invest millions in cleanup, another obstacle looms: the El Portal Village Council passed a law last year limiting future retail development to 50,000 square feet. Anything larger would require a special vote of the council, says village manager Walker.

According to the FIU study, which was commissioned by Jobs With Justice, the average annual income of a trailer-park resident is under $12,000. When FIU researchers asked 269 residents from several Miami-Dade trailer parks (not including Little Farm) what would happen if their communities were shut down, half replied they would become homeless.

Some Little Farm homeowners say they want to get out while they still can. "For Sale" signs dot windows throughout the park. Jean Reuben, who has heard rumors since 2003 that the park would be sold, is holding out for $6000. Neighbor Yolanda Dorce says she'd sell her trailer for a mere $400 if she could.

Alyce Gowdy Wright says it's fairly common for trailer-park residents to become somewhat apathetic about their future. "There comes a point when the park changes hands so many times, people get beleaguered," she observes. "It's difficult to have a constant sense of uncertainty about being able to stay in your home. It's difficult to live in that emotional state. It doesn't mean they don't care. It just means they're tired."

*Feedback: letters@biscaynetimes.com*